Virginia SHEPHERD, Plaintiffs,

v.

CITY OF SALEM, Defendant.

No. 02–1094–HO.

United States District Court,
D. Oregon.

June 8, 2004.

Larry L. Linder, Lafky & Lafky, Salem, OR, for Plaintiffs.

Kim E. Hoyt, Garrett Hemann Robertson Jennings, Comstock & Trethewy, P.C., Salem, OR, for Defendant.

## ORDER

HOGAN, District Judge.

Plaintiff brings multiple claims related to her employment with the City of Salem, including federal and state law claims of age and gender discrimination, hostile work environment and retaliation, and state law claims of intentional infliction of emotional distress (IIED), whistleblowing, and retaliatory discharge. Defendant moves for summary judgment against each of plaintiff's claims.

Plaintiff moved for an order striking defendant's evidence on the grounds that the evidence is not properly authenticated with an appropriate affidavit. Defendant cured any defect with the filing of the affidavit of Kim Hoyt, attorney for defendant. *See* [# 63]. Defendant moved for an order striking the factual assertions contained in several paragraphs of plaintiff's response to defendant's concise statement of material facts (CSMF) on the ground that the assertions rely on the testimony of a witness with no demonstrated personal knowledge, or who is not qualified to offer opinion testimony. Defendant's motion to strike is denied, but the court will considers defendant's objections in determining whether there is admissible evidence demonstrating the existence of disputes of material fact.

*Factual Background*

Except where indicated, the following facts are undisputed for the purpose of resolving defendant's motion for summary judgment. Plaintiff began her employment with defendant City of Salem (City) on November 1, 1984 in the City's Building and Safety Division as a Clerk III. The division is divided into three departments: Inspection, Plan Check, and Permit. Elizabeth Reese was plaintiff's supervisor in the Permit Division; Larry Ellenwood was a supervisor in another division; and Nate Brown was Building and Safety Department Administrator since 1997 or 1998. Plaintiff was promoted to Senior Permit Specialist effective January 1, 1986, and received a raise. The parties dispute whether Senior Permit Specialist is a "quasi-management" position with supervisory duties. Plaintiff testified that she covered for her supervisor, Elizabeth Reese, in Reese's absence, until shortly after Nate Brown was hired, at which time her supervisory responsibilities were taken away. Pl's Depo. at 25–26. A letter generated from the City's Personnel Department states that the duty of "Acting in Capacity for the PAC [Permit Application Center] Coordinator" was removed from plaintiff's classification, but that her classification still involved making sure there is coverage at the front counter and that time sheets are turned in, training new employees and acting as a resource person. Def's Ex. 29.

Plaintiff performed her duties in a satisfactory manner, received positive evaluations and never received a reduction in pay or demotion. Plaintiff complained at least once about all of her supervisors and every member of the [Permit Application Cen-

ter] staff. Plaintiffs' complaints covered a variety of issues, including tardiness, improper use of company property or the internet, eating lunch at a work station, and failure to assist plaintiff. Plaintiff complained about Larry Ellenwood, a supervisor in another department. Plaintiff complained that Ellenwood inappropriately touched female staff members and made inappropriate comments to female staff about female staff and customers. Plaintiff considered the allegedly inappropriate touching and comments to be sexual harassment. None of the women that plaintiff alleges were subjected to sexual harassment by Ellenwood filed a formal complaint regarding Ellenwood. Leah Knudsen complained to a co-worker in the Public Works Department that Ellenwood made a sexual advance towards Knudsen. Plaintiff was not the subject of inappropriate touching or sexual comments by Ellenwood or any other City employee.

On October 4, 2001, Ken Eatwell, a Building and Safety Division employee, filed a complaint regarding Ellenwood. The complaint alleged harassing, intimidating and explosive behavior by Ellenwood toward employees, but did not allege sexual harassment. Eatwell is still employed with the City.

At some point after September, 2001, supervisors of the Building and Safety division decided to eliminate two office assistant positions, a structural inspector position, a plans examiner position, and the position of senior permit specialist. Plaintiff was the only senior permit specialist in the Building and Safety Division. After deciding which positions to eliminate, the supervisors were required to select staff to be laid off in accordance with the Collective Bargaining Agreement (CBA), which requires that layoffs occur in reverse order of seniority within a classification. Def's Ex. 28 at 4. The City notified plaintiff of the termination of her employment in a letter dated November 14, 2001 from Nate Brown, Building and Safety Administrator. The letter cited budgetary shortfalls as the reason for the termination. Def's Ex. 23. Plaintiff filed a grievance against Ellenwood on December 3, 2001. Plaintiff's last day of work with the City was January 4, 2002. Plaintiff was 57 years old at the time she was laid off.

The other employees laid off with plaintiff included a 35 year old male residential plans examiner, two female office assistants 1, ages 33 and 53, and a 54 year old male structural inspector. Employees remaining in plaintiff's work group after the layoffs included a female permit application coordinator in her 50s, and five permit specialists (two males and three females). Two of the remaining permit specialists are in their early 30s and the other three are 58, 53 and 33, respectively.

After receiving notice of her impending lay off, plaintiff asked to be reclassified from senior permit specialist to permit specialist. The City personnel director denied the request in a letter dated December 12, 2001. Def's Ex. 29. The letter indicates that after talking with Nate Brown, the personnel director determined that there is a significant difference between senior permit specialist and permit specialist, because the former position involves training new employees, acting as a resource, and ensuring that there is adequate front counter coverage and that time sheets are turned in. *Id.*

After receiving notice of her impending lay off, plaintiff filed a written grievance alleging that she was not being laid off due to budget shortfalls, but was instead being laid off due to her gender and age and for the purpose of sexual harassment, and in retaliation for whistleblowing activities. Plaintiff also asserts that she was terminated because she reported a coworker for referring customers to the coworker's hus-

band's architecture business. Plaintiff was not aware that the coworker's conduct violated any particular rule or statute, but plaintiff believed the coworker's conduct was sufficiently serious to merit reporting to plaintiff's supervisor.

As a result of her termination, plaintiff asserts that she became upset, had difficulty sleeping, and experienced some hair loss. Plaintiff did not see a doctor for these symptoms. Plaintiff contends that she could not afford to see a doctor. Plaintiff made one trip to a psychologist, but felt he was not helpful. Plaintiff filed the complaint in this case on August 9, 2002.

On one occasion, plaintiff and coworker Monard Nimmo got into an argument. After Nimmo yelled at plaintiff, "Who the hell made you God?", supervisor Nate Brown told plaintiff, "You need to settle down; this problem's been taken out of context." Plaintiff felt Brown's response was inappropriately directed to her, and not to Nimmo.

On another occasion, plaintiff interrupted Brown during a meeting in order to inform Brown that his wife was on the phone stating that the matter was urgent. Brown responded to plaintiff's interruption by yelling at plaintiff, "don't bother me now, I'll handle it later." When plaintiff presented Brown with questions, Brown was very fast and abrupt with her, or would tell her, "I don't have time for this." Plaintiff did not see Brown treat males in this manner. Plaintiff witnessed Brown raise his voice to other women, but did not witness Brown raise his voice to men.

Plaintiff testified that meetings regarding employee problems were primarily confidential. However, based on her observations of those conversations between Brown and male employees to which she was privy, plaintiff testified that Brown had time to listen to the male employees, but did not have time to listen to her

problems. When plaintiff complained about Ellenwood's advances toward female employees, Brown told plaintiff in essence that it must be that plaintiff did not hear or see things correctly, and "well, you know that person always jokes." Pl's Depo. at 44.

Ellenwood told plaintiff that if she were more like him, she would not be single. Plaintiff testified that when she went to Ellenwood for help with work, he addressed her by saying such things as "what the hell do you want now?" Plaintiff complained to supervisors Reese and Brown about this conduct on numerous occasions. Ellenwood denies any verbal exchanges that were hostile in nature. Plaintiff agreed that it is fair to say that Ellenwood was "a bit of a smart-aleck," and that she heard Ellenwood use these words with other employees. Pl's Depo. at 88–89.

On one occasion, plaintiff complained to the personnel department that Ellenwood would not sign off on overtime hours worked by plaintiff. When she returned, Ellenwood "got in her face" in the words of plaintiff, and yelled at her, "I don't appreciate you going to personnel, and you will never do that again," and/or "the hell with you, you won't ever do that again." Plaintiff believes that she complained about this conduct to Brown. Brown does not recall whether this is so. Plaintiff also observed Ellenwood raise his voice to female employee Dink Lane, and plaintiff did not observe Ellenwood raise his voice to male employees.

Dink Lane tried to fix a copy machine jammed by Ellenwood. Plaintiff witnessed Ellenwood tell Lane, "get the hell away from this. I can fix it myself." Plaintiff complained to Reese about this conduct. Reese responded, "it's out of my hands. I don't get into that."

Approximately two days before she received her layoff notice, plaintiff complained to Brown that a contractor was tracing plans. Brown told plaintiff not to worry about it, and that plaintiff worries about things too much. In May, 2001, plaintiff complained to Reese that an employee's suggestion to a customer that the customer use the employee's husband's business constituted a conflict of interest. Pl's Depo. at 123–24.

Late in the summer of 2001, a female employee adjusted what plaintiff describes as a low-cut blouse worn by the employee. plaintiff witnessed Ellenwood say to the employee, "oh, here, let me help you with that."

Plaintiff witnessed Ellenwood use the internet to visit a dating service website on five or six occasions. Brown received complaints about Ellenwood's internet usage; the complaints were investigated, and the results of the investigation confirmed plaintiff's observations.

Ellenwood's supervisor, William Whiteside, informed Permit Specialist Jim Nunez that the City had training and promotional opportunities for the position of Building Inspector. Plaintiff testified that when she asked why she was not privy to these opportunities, Whiteside told her it was "because you don't want to get your fingernails or your toenails chipped."

Ellenwood testified that the City has a sexual harassment policy. He stated, "[i]t's a piece of paper in a notebook. I couldn't quote it." Ellenwood Depo. at 32.

Ellenwood had conversations about relationships with the opposite sex with employees whose first names are Dusty, Shirley and Deedee. Ellenwood testified that he received hugs from employees named Deedee, Shirley, Linda and Amy. Ellenwood Depo. at 33. Plaintiff testified that

she witnessed Ellenwood put his arm around female employees and "rub up" against them.

The City investigated certain alleged conduct of Ellenwood, and the investigation resulted in Ellenwood receiving a six month reduction in pay and last chance agreement.[1] Ellenwood testified that he believed plaintiff's allegations were the basis for the discipline imposed. Defendant contends that Ellenwood was reprimanded for a comment he made to a coworker other than plaintiff.

Dink Lane did not like the way Ellenwood talked to her and other employees, including Ellenwood's habit of looking her in the eye and saying "get the hell out of my way." Lane told her supervisor that she did not believe that Ellenwood should be talking to her that way, and that his conduct was embarrassing to her. Lane's supervisor told her to talk to Ellenwood about the matter. Lane did so, but Ellenwood's conduct did not cease. Lane received a lay off notice. Lane believes she was laid off in response to her complaints. Lane complained to Reese that Ellenwood told her, "I'll kick your ass."

When asked during her deposition whether she had witnessed instances of gender discrimination, Lane testified that Nate Brown made comments that essentially state that "woman is not equal." Lane could not recall the exact comments. Lane Depo. at 30.

Ellenwood served on the committee that decided to eliminate plaintiff's position.

Reese did not believe that Ellenwood actually committed some form of sexual harassment because she viewed his conduct as part of Ellenwood's jocular manner. Reese recalls Ellenwood making comments to females such as "you look

---

1. The evidence cited by plaintiff does not specify the nature of the conduct that the City investigated, nor does plaintiff allege the nature of the conduct.

great" and comments about hair. She does not recall Ellenwood making such comments to males.

## Discussion

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### I. First Claim: Age Discrimination— Disparate Treatment

Defendant argues that plaintiff cannot establish a prima facie case of disparate treatment age discrimination, and cannot produce sufficient evidence to create a triable issue of fact that defendant's proffered reason of budgetary constraints was a pretext for age discrimination. A prima facie case requires proof that the plaintiff belongs to a protected class, performed satisfactorily, and was discharged under circumstances giving rise to an inference of age discrimination. *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312–13, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). It is undisputed that plaintiff was 57 years old at the time of her discharge and she received satisfactory performance evaluations.

Plaintiff contends that she was fired and replaced by a 33 year old man. Were this true, the prima facie case would be established. *Pottenger v. Potlatch Corp.,* 329 F.3d 740, 745 (9th Cir.2003). What actually happened is slightly more complicated than plaintiff represents. After plaintiff received notice that her position would be eliminated, plaintiff requested to be reclassified from senior permit specialist to permit specialist. Plaintiff contends that if defendant would have allowed her request, Jim Nunez, a 33 year old permit specialist, would have been laid off instead of her, because Nunez had been with the PAC for only a few months, and

plaintiff would have had seniority. The order of lay off provision of the CBA supports this contention. Def's Ex. 28 at 4. As noted, the personnel department denied plaintiff's request for reclassification after talking with Nate Brown and determining that there were significant differences between the senior permit specialist and permit specialist positions. Of course the trier of fact need not accept defendant's proffered reason for denying her request for reclassification, and the stated reason does not appear to preclude reclassification. While the two positions may not be identical, it appears undisputed that as a senior permit specialist, plaintiff was qualified for the position of permit specialist. The City points only to additional responsibilities of the senior permit specialist; it does not point to responsibilities of the permit specialist for which plaintiff is not qualified. *See* Def's Ex. 29. Based on the close proximity in time of Nunez's hire, plaintiff's lay off notice, and the denial of plaintiff's request for reclassification, the court concludes that plaintiff has produced sufficient evidence to permit an inference of discrimination, and has therefore established a prima facie case of age discrimination.

Defendant has articulated a legitimate, nondiscriminatory reason for terminating plaintiff: budget shortfalls. Def's Ex. 23. Plaintiff must point to sufficient evidence to establish an issue of fact that the proffered nondiscriminatory reason is a pretext. Plaintiff may rely on direct or circumstantial evidence of discriminatory motive, and evidence that casts doubt on defendant's proffered explanation. *Id.* at 746. Plaintiff's burden is not high; she need only show that a rational trier of fact could, on all the evidence, find that defendant's explanation is pretextual. *Id.* Plaintiff points to the following evidence: (1) the denial of her request for reclassifica-

tion despite the fact that she was qualified, (2) testimony of Nate Brown evidencing that reclassification was an option for the city, as evidenced by the City's reclassification of another employee who was part of the same reduction in force as plaintiff,[2] (3) the fact that the City hired Nunez despite the alleged budget shortfall, and (4) the testimony of union steward and Plumbing Inspector Sonny Mauldin that the Department's fund balance never dipped below $1.5 million dollars at any time after the alleged budgetary crises. Mauldin also testified that he does not believe there was a budget crisis, and layoffs were never required because of the substantial fund balance. Defendant objects to the opinion testimony of Mauldin. On the present record, the court agrees with defendant that Mauldin is not qualified to opine as to the financial health of the City or the Building and Safety Department.

■ Nevertheless, the court concludes that plaintiff has produced sufficient evidence to create a triable issue of fact as to defendant's allegedly discriminatory intent. There is evidence that reclassification was an option, and a jury could infer that defendant's stated reason for denying reclassification did not mandate the denial. A newly hired, substantially younger employee with little experience was retained, while plaintiff, a 57 year old, was laid off despite having nearly 20 years of experience.

## II. Second Claim: Title VII Sex Discrimination

### A. Count One: Disparate Treatment

■ As with plaintiff's age discrimination claim, it is undisputed that all elements of the prima facie case are satisfied save improper discriminatory motive. For the reasons discussed above, plaintiff has pointed to sufficient evidence to create a triable issue of fact regarding defendant's alleged discriminatory intent. In addition to the above cited evidence, plaintiff testified that Whiteside offered training and professional development opportunities to Nunez, and not to her, and Dink Lane testified that she heard Brown make comments to the effect that "woman is not equal." Defendant is not entitled to summary judgment on this count.

### B. Count Two: Hostile Work Environment

An employer is liable under Title VII for conduct giving rise to a hostile environment where the employee proves (1) that he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Conduct must be extreme to amount to a change in the terms and conditions of employment. To be actionable under Title VII, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. Harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. The motivation can be a general hostility to the presence of women in the workplace. Courts are to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically

---

**2.** Brown testified that the employee prevailed at arbitration on his claim that he was reclassified by the City so he could be terminated

without the City running afoul of the seniority in layoff provisions of the CBA.

threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.

*Kortan v. California Youth Authority*, 217 F.3d 1104, 1109–10 (9th Cir.2000) (citations and quotations omitted). The parties dispute whether there is sufficient evidence for plaintiff to survive summary judgment in favor of defendant on her hostile work environment claim.

■ Plaintiff's cited evidence of hostile work environment is as follows. Elizabeth Reese was plaintiff's supervisor in the Permit Division; Larry Ellenwood was a supervisor in another division within the Building and Safety Department; and Nate Brown was Building and Safety Department Administrator. Ellenwood hugged or received hugs from three or four female employees. Plaintiff saw Ellenwood put his arm around and "rub up" against three female employees. One of these employees told plaintiff that she complained to a coworker that Ellenwood made a sexual advance towards her. Plaintiff witnessed Ellenwood hug this employee with his chest to her back on multiple occasions. Another of the employees told two coworkers that she felt uncomfortable with things that Ellenwood did. Ellenwood commented to that employee, "I sure like that blouse ... it really shows me a lot." Ellenwood offered to help the employee adjust her blouse. Plaintiff testified that Ellenwood placed himself on one knee in front of the third employee, took her in a hug, placed his face against the side of her face, "took a large smell," and said, "you really smell good." Ellenwood commented on the employee"s attire, stating "nice looking pants," and "I like that short skirt you have on." Ellenwood made comments to employees about female customers, such as "did you see that set of hips in those pants?" and "have you seen how well-stacked that one is?" He also made hand gestures depicting an hour

glass shape. When there were attractive women at the front desk, Ellenwood would "butt-in and take over." Plaintiff complained to Reese about Ellenwood's comments on more than twenty occasions, and to Brown on five or six occasions.

Plaintiff felt that Brown treated her differently than male employees; when she went to him with a problem, he would tell her that she must not have heard something correctly, or that "well, you know that person always jokes." Brown did not take time to discuss plaintiffs' problems, although he had time to discuss those problems of male employees which plaintiff was privy to observe. Ellenwood yelled at plaintiff after she went to the personnel department to complain about Ellenwood not signing off on her overtime.

Viewed in the light most favorable to plaintiff, Ellenwood's conduct is not as offensive or harassing to plaintiff as the conduct in cases where courts have held that the evidence was sufficient for a rational trier of fact to conclude that a hostile work environment existed. *See Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104 (9th Cir.1998) (repeated sexual remarks to plaintiff including relating sexual fantasies and desire for sex with plaintiff, and asking over loudspeaker whether plaintiff needed help changing clothes); *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864 (9th Cir.2001) (relentless campaign of vulgarities by male coworkers and supervisor against male employee at least once per week and often several times per day); *Anderson v. Reno*, 190 F.3d 930 (9th Cir.1999) (female FBI agent endured host of sexually harassing incidents over eight year period including references by supervisor as "office sex goddess," "sexy" and "gorgeous," repeated comments by coworker regarding her buttocks and patting of her buttocks, various vulgar notes, being told by her supervisor in front of group that a presentation she was about to pres-

ent was her "training bra session"); *EEOC v. Hacienda Hotel*, 881 F.2d 1504 (9th Cir.1989) (repeated vulgarities, sexual remarks and requests for sexual favors from chief of engineering to hotel maids); *cf. Kortan*, 217 F.3d 1104 (no hostile work environment where supervisor on one or two prior occasions called female employee other than plaintiff a "castrating bitch," "madonna," or "regina," and on several occasions on a different day referred to plaintiff as "Medea," not "Artemis").

Not only are the comments not as vulgar as in the actionable sexual harassment work environment cases, but the allegedly sexually harassing conduct was not directed toward plaintiff. Mostly, the conduct can be said only to be offensive to plaintiff, and not physically threatening or intimidating. The only evidence that Ellenwood's conduct caused diminished productivity is plaintiff's testimony that she felt that Ellenwood's sexual harassment of a coworker hurt the productivity of the coworker and of plaintiff. Pl's depo. at 139. Plaintiff did no elaborate. Ellenwood was not plaintiff's supervisor. While Ellenwood's conduct may have been offensive, it was not as extreme as in the cases cited. Viewed in the light most favorable to plaintiff, the complained of conduct is insufficient to be actionable under this theory. Defendant is entitled to summary judgment on the hostile work environment claim.

### C. Count Three: Retaliation

▆▆▆ Defendant argues that plaintiff cannot prevail on her Title VII retaliation claim because there is no evidence that she complained of conduct prohibited by Title VII, or that her voluminous complaints

were causally related to her termination.[3] The court cannot say at this stage that it was objectively unreasonable for plaintiff to believe that some of the conduct she complained about was prohibited by Title VII. As discussed above, a trier of fact could infer that defendant's stated reason for denying plaintiff's request for reclassification was a pretext. The request was denied shortly after plaintiff filed her grievance against Ellenwood alleging that he engaged in sexually harassing behavior. The record is largely silent as to the proximity of plaintiff's complaints to her supervisors regarding Ellenwood in relation to the decision to lay off plaintiff. Further development of the facts will help determine whether the proximity was such to permit an inference of retaliatory intent. Genuine disputes of material fact and the need for further factual development precludes summary judgment for defendant on this claim at this time.

### III. Third Claim: State Statutory Discrimination

The parties agree that the analysis for these claims is the same as for plaintiff's federal discrimination claims. Plaintiff may proceed on her disparate treatment and retaliation theories, but not on her hostile work environment theory.

### IV. Fourth Claim: Intentional Infliction of Emotional Distress

▆▆▆ Defendant contends that plaintiff cannot prevail on her claim for IIED because there is insufficient evidence that (1) defendant intended to cause severe emotional distress or should have known that severe emotional distress was substantially certain to occur, (2) plaintiff suf-

---

**3.** A prima facie case of retaliation requires some proof that a plaintiff opposed a practice he reasonably believed was prohibited by Title VII, defendant subjected plaintiff to an adverse employment action, and there is a causal connection between the two. *Jordan v. Clark*, 847 F.2d 1368, 1373 (9th Cir.1988); *Nelson v. Pima Community College*, 83 F.3d 1075, 1082 (9th Cir.1996).

fered severe emotional distress, and (3) defendant's conduct amounted to a transgression of the bounds of socially tolerable conduct. The court agrees that plaintiff has not alleged sufficiently outrageous conduct to state a claim for IIED, even under the somewhat relaxed standard that applies where the litigants were employee and employer at the time of the alleged conduct. *See McGanty v. Staudenraus*, 321 Or. 532, 901 P.2d 841 (1995).

## V. *Fifth Claim: Whistleblower Statute*

In this claim, plaintiff alleges that defendant violated Or.Rev.Stat. § 659A.203(1)(b)(A), which makes it an unlawful employment practice for a public employer to retaliate against an employee who discloses "information that the employee reasonably believes is evidence of a violation of any federal or state law, rule or regulation by the state, agency or political subdivision." Defendant argues that this claim is barred by the applicable statute of limitations, and that plaintiff did not engage in any activity protected by the statute.

 Prohibited conduct occurring before January 1, 2002 is subject to the 90–day limitations period provided by Or.Rev. Stat. § 659.530 (1999). *See* Historical and Statutory Note to Or.Rev.Stat. § 659A.215. For limitations purposes, plaintiff contends that the unlawful employment practice she complains of is the termination of her employment, which she argues occurred on her last day of work, January 4, 2002. Any unlawful employment action occurred on the date plaintiff received the lay off notice (November 14, 2001) or on the date plaintiff received the notice of the denial of her request for reclassification (December 12, 2001). *See Dobie v. Liberty Homes, Inc.*, 53 Or.App. 366, 632 P.2d 449, 451–52 (1981);[4] *see also Daniels v. Fesco Division of Cities Service Co.*, 733 F.2d 622, 623 (9th Cir.1984) (interpreting California law). The 90–day limitations period applies to this claim, and it is time barred, as the complaint was not filed until August 9, 2002.

## VI. *Sixth Claim: Wrongful Discharge*

 Plaintiff alleges in two separate counts under this claim that (1) her complaints to her supervisors of the sexual harassment in the office perpetrated by Ellenwood involve the exercise of a legal right important to the public interest related to her role as an employee, and (2) her work to stop sexual harassment in the workplace as well as her complaint about a contractor copying plans fulfill important societal obligations. Complaint at 11–12. Defendant argues that plaintiff's wrongful discharge claim is preempted, and in any event, plaintiff cannot prove the causation element of the tort. Title VII and Oregon statutes do not preempt a wrongful discharge claim premised on the allegation that plaintiff was discharged in retaliation for opposing discrimination based on sex.[5]

---

**4.** Lest *Dobie* be read to hold that a claim for unlawful termination accrues on the last day of work regardless of whether earlier notice of termination is received, it is noted that the *Dobie* court found persuasive United States Supreme Court cases interpreting the Civil Rights Act of 1964 which hold that a cause of action related to the termination of employment accrues at the time the plaintiff receives notice of termination, and not at the time employment ceases. *Dobie*, 632 P.2d at 451 (citing to, *inter alia, Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). To the extent *Dobie* could be read to state that a cause of action accrues upon the last day of work, it is only because the court applied the reasoning of the United States Supreme Court to the facts of the case, which were that the plaintiff's employment ceased upon his receipt of notice of termination. *Dobie*, 632 P.2d at 451.

**5.** There is an inapplicable (and perhaps inexplicable) exception to this rule where the wrongful termination is in response to com-

*Holien v. Sears, Roebuck and Co.*, 298 Or. 76, 689 P.2d 1292, 1303–04 (1984); *cf. Walsh v. Consolidated Freightways*, 278 Or. 347, 563 P.2d 1205 (1977) (claim for discharge in retaliation for report of workplace safety violation is preempted). The result should be the same for a claim alleging discharge in retaliation for whistleblowing activities, as the limited statutory remedies are the same. *See* Or.Rev. Stat. § 659A.885.

The court has already held that plaintiff has created a triable issue with respect to causation on her Title VII retaliation claim, and reaches the same conclusion with respect to plaintiff's allegation that her report of a contractor tracing floor plans caused the termination of her employment. Plaintiff testified that she received notice of her termination approximately two days after reporting to Reese and Brown that a contractor was copying building plans. This claim is not preempted, and there are triable issues of causation. Defendant is not entitled to summary judgment on this claim.

Defendant is entitled to summary judgment on count two of plaintiff's second claim (Title VII/hostile work environment), the hostile work environment theory under plaintiff's third claim (alleging discrimination in violation of state statute), plaintiff's fourth claim (IIED), and plaintiff's fifth claim (whistleblower).

### Conclusion

For the foregoing reasons an as provided herein, plaintiff's motion to strike [# 59] is denied; defendant's motion to strike [# 66] is denied; defendant's motion for summary judgment [# 34] is granted in part, and denied in part.

IT IS SO ORDERED.

---

plaints of workplace safety. In such cases, the wrongful discharge claim is preempted.

*See Walsh v. Consolidated Freightways,* 278 Or. 347, 563 P.2d 1205 (1977).