Charles R. **POTTENGER,**
Plaintiff–Appellant,

v.

**POTLATCH CORPORATION,**
a Delaware corporation,
Defendant–Appellee.

No. 02–35235.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 4, 2003.

Filed May 19, 2003.

Candy W. Dale and Tamsen L. Leachman, Hall Farley Oberecht & Blanton, Boise, ID, for the appellant.

Michael E. McNichols, Clements Brown & McNichols, Lewiston, ID, Jerrold C. Schaefer and Lisa M. Pooley, Hanson, Bridgett, Marcus, for Appellee.

Before: REINHARDT, W. FLETCHER and GOULD, Circuit Judges.

## OPINION

WILLIAM A. FLETCHER, Circuit Judge:

Charles R. Pottenger worked for the Potlatch Corporation, a diversified forest products company, for 32 years until he was discharged in April 2000 at age 60. During his tenure at Potlatch, Pottenger rose to Group Vice President of Pulp and Paper, reporting directly to Potlatch's President, Richard Paulson. After his dismissal, Pottenger sued Potlatch alleging that he was forced to retire in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and the Idaho Human Rights Act, Idaho Code §§ 67–5901 *et seq.* Pottenger also claims intentional infliction of emotional distress and defamation under Idaho law. The district court dismissed all Pottenger's claims on summary judgment, and we affirm.

## I

Pottenger joined Potlatch in 1968 after receiving his Ph.D. in paper technology. He held a variety of positions in the company, generally moving up through the ranks. In 1993, he became a group vice president, and at the date of his termination he was Group Vice President of Pulp and Paper. As a group vice president, Pottenger reported directly to the President and Chief Operating Officer of Potlatch, Richard Paulson, who reported to the CEO, Pendleton Siegel. Pottenger worked in Lewiston, Idaho, and oversaw Potlatch's operations in Idaho and Arkansas, including the Idaho Pulp and Paperboard Division ("IPPD") based in Lewiston. After the cost of capital, IPPD lost $63.7 million in 1997, $67.4 million in 1998, $85.0 million in 1999, and $14.5 million in the first quarter of 2000.

In January 1999, shortly before he became president of Potlatch, Paulson attended an executive training course at the University of Michigan. After attending the training course, Paulson decided that Potlatch needed to make "real and significant" changes in order to improve its performance. On November 23, 1999, Pottenger and three of his colleagues responsible for pulp and paperboard met with Paulson in Spokane, Washington, to talk about turning the pulp and paperboard business around. At the meeting, Paulson characterized Pottenger and his team as an "old management team" using an "old business model."

In February 2000, Paulson gave Pottenger his performance review for 1999. Pottenger received an MR- rating. In the Potlatch rating system, MR+ means that the individual has more than met the requirements of the job. MR means that the individual has fully met the requirements of the job. MR- means that there is some reason for concern. MM means that

the individual has met the minimum requirements for the job. Out of twelve managers listed in Potlatch's records that year, two received MR+ ratings, six received MR ratings, three received MR- ratings, and one received an MM rating. On the review form, Paulson characterized Pottenger's strengths as "smart," "knows business," "loyal to Potlatch," "technical knowledge," "enthusiastic leader," and "wants Potlatch to succeed." He also wrote the following under areas for improvement: "break victim mentality in IPPD," "be a strong leader in stopping the 'mill town' mentality in Lewiston," "set higher expectations for people," and "think in terms of opportunities and develop change strategies to get there."

In March 2000, the Potlatch management committee, which included Pottenger, met to discuss cost-cutting strategies. Because the company was in financial trouble, the committee members made a commitment to each other to eliminate "deadwood," and to do so quickly. At the end of March, the committee distributed a memo announcing that the company was embarking on a course of significant change in response to poor earnings. The changes included a wide array of cost-cutting measures (including cuts in travel, mail, cell phone, and trade association expenses). The memo also announced that over the next two months the committee would be "evaluating where to make significant reductions in the number of salaried positions."

The management committee met again on April 12, 2000, to discuss the company's plan for a reduction in force. During the day, Paulson and Siegel (Potlatch's CEO) met separately from the committee for 10–15 minutes to discuss Pottenger. Paulson described his concerns that Pottenger was not capable of bringing about real and significant change in the Lewiston operation. At their meeting, Paulson and Siegel decided to fire Pottenger.

Paulson told Pottenger of his termination on April 18, 2000. When Pottenger asked Paulson why he was being fired, Paulson stated that he lacked confidence that Pottenger had the commitment to make the hard decisions necessary to make Potlatch successful.[1] Paulson offered Pottenger an enhanced severance package as part of his termination. Without the enhancement, Pottenger was entitled to 52 weeks of severance pay (equaling his yearly base pay of $324,120) and one year of employee benefits (medical, dental, and life insurance). After a year, Potlatch would pay monthly retirement benefits of $15,134.74 and 75% of Pottenger's medical, dental, and life insurance premiums. The enhanced severance package included an additional 26 weeks of base pay (for a total of 78 weeks or $486,180) and an additional monthly payment thereafter of $5,401.74 (for a total monthly payment of $20,536.48). The enhanced package also offered fully-paid medical, dental, and life insurance until age 65 (the mandatory retirement age for executives at Potlatch), and 75% payment thereafter. In return for the enhanced severance package, Paulson asked Pottenger to sign a separation agreement waiving any claim under the Age Discrimination Employment Act.

The next day, the company distributed a memo to all employees from Paulson stating that Pottenger had "elected to take early retirement." Pottenger had declined Paulson's offer the previous day to help

**1.** Pottenger and Paulson characterize Paulson's words slightly differently, but the parties agree to the substance of the remarks.

write the notice. The memo stated that Craig Nelson, formerly the Consumer Products Division Vice President, was assuming Pottenger's position. At the time, Pottenger was 60 years old and Nelson was 43.

Pottenger ultimately declined the enhanced severance package and refused to waive his claims under the ADEA. He then brought suit in federal district court claiming age discrimination under the ADEA, 29 U.S.C. §§ 621 *et seq.*, and the Idaho Human Rights Act,[2] Idaho Code § 67–5909, and claiming defamation and intentional infliction of emotional distress.

The district court granted Potlatch's motion for summary judgment. The court found that Pottenger had made out a prima facie case of age discrimination, but that Potlatch had articulated a legitimate, nondiscriminatory reason for discharging Pottenger—that he was not prepared to make the tough decisions necessary to turn around the Idaho Pulp and Paper Division. The court found that Pottenger had not raised a genuine issue of material fact concerning whether the reason articulated by Potlatch was pretext. Pottenger, the court noted, did not contest that IPPD lost money during his tenure as head of that division. Rather he attacked the company's decision to address the losses by replacing him. The court also rejected Pottenger's disparate impact age discrimination claim because of the unreliability of his statistical evidence.

The court also granted summary judgment against Pottenger on his defamation and intentional infliction of emotional distress claims. It found that the company's statement that Pottenger had "elected" early retirement did not constitute defamation *per se*. It concluded that Potten-

ger had not supported his intentional infliction of emotional distress claim because there was no evidence in the record tending to show that Potlatch's conduct was "extreme and outrageous."

■ We review a grant of summary judgment de novo. *Frank v. United Airlines, Inc.*, 216 F.3d 845, 849 (9th Cir. 2000).

## II

### A. Disparate Treatment Age Discrimination Claim

■ The ADEA makes it "unlawful for an employer ... to fail or refuse to hire or to discharge any individual [who is at least 40 years old] ... because of such individual's age." 29 U.S.C. § 623(a)(1). To prove age discrimination under a disparate treatment theory, Pottenger must show that his age " 'actually played a role in [Potlatch's decisionmaking] process and had a determinative influence on the outcome.' " *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)). In evaluating age discrimination claims, we employ the familiar framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994).

■ Pottenger has made out a prima facie case of age discrimination. He was 60 years old; his most recent performance review grade of MR- was not outstanding, but indicated that he was meeting the requirements of the job; he was discharged; and he was replaced by Craig

---

**2.** The Idaho Human Rights Act incorporates the major protections of the ADEA into state law. *See* Idaho Code §§ 67–5901, 67–5909.

The parties have not separately briefed the state and federal discrimination claims, and we treat them together.

Nelson, then 43 years old, a substantially younger employee with equal or inferior qualifications. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000). Potlatch, in turn, has articulated a legitimate, nondiscriminatory reason for terminating Pottenger: a lack of confidence that Pottenger could make the hard decisions necessary to turn around the ailing Idaho Pulp and Paperboard Division, which he headed. It is undisputed that IPPD lost over $200 million during 1997, 1998, 1999, and the first quarter of 2000. *See Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 (holding that the employer's burden is one of production, not persuasion).

Pottenger may establish pretext through evidence showing that Potlatch's explanation is unworthy of belief or through evidence showing that discrimination more likely motivated its decision. Pottenger need not rely on only one type of evidence, and he has offered evidence both to cast doubt on Potlatch's credibility and to show a discriminatory motive. *Id.* at 143, 120 S.Ct. 2097; *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000). At the summary judgment stage, Pottenger's burden is not high. He must only show that a rational trier of fact could, on all the evidence, find that Potlatch's explanation was pretextual and that therefore its action was taken for impermissibly discriminatory reasons. If he does so, then summary judgment for Potlatch is inappropriate. *Wallis*, 26 F.3d at 889.

▆▆▆ Pottenger advances several reasons that, in his view, undermine Potlatch's explanation of his discharge. They include positive comments in his performance review, shifting justifications for his dismissal, the brevity of the meeting at which the president and CEO reached their decision to discharge him, and the procedures followed in his termination.

Considering all of Pottenger's evidence together, however, we conclude that he has not created a genuine issue of material fact. Pottenger's performance review did contain some positive comments, but it also contained negative comments specifically singling out concerns with his performance in managing IPPD. Potlatch's proffered explanation does not state that Pottenger was incompetent or a generally bad employee; rather, it states that Potlatch lacked confidence that Pottenger could help turn the company around. Instead of casting doubt on Potlatch's explanation, the statements in the performance review are consistent with it. Moreover, although " 'fundamentally different justifications for an employer's action … give rise to a genuine issue of fact with respect to pretext,' " *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir.1997) (quoting *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir.1993)), Pottenger has pointed to no evidence suggesting that Potlatch has ever offered a reason for his dismissal other than doubt about his commitment to making hard decisions to help the company.

Finally, the duration of the meeting between Paulson and Siegel at which they made the termination decision and the manner of Pottenger's discharge do not create a factual issue regarding the company's credibility. The meeting between Paulson and Siegel at which they ultimately made the decision to terminate Pottenger was short, but it obviously came at the end of a much longer process of evaluation and deliberation. There is also little evidence of an established formal or informal company procedure for discharging high-level employees. In fact, when Pottenger himself discharged the then-head of the Idaho Pulp and Paper Division in 1997, he did so in a manner similar to his own discharge. Potlatch's failure to follow some unspecified procedure in its treat-

ment of Pottenger does not cast any doubt on its proffered reason for his termination.

■ To show discriminatory motive, Pottenger states that Paulson made comments referring to an "old management team," an "old business model," and "deadwood." Remarks can constitute evidence of discrimination. The Supreme Court has held that telling an employee he "was so old [he] must have come over on the Mayflower" and "was too damn old to do [his] job" constituted evidence of age discrimination. *Reeves,* 530 U.S. at 151, 120 S.Ct. 2097 (alteration in original). We have found a triable issue of material fact when an employee was told upon applying for an executive position that the board "wanted somebody younger for the job," *Schnidrig v. Columbia Mach., Inc.,* 80 F.3d 1406, 1410–11 (9th Cir.1996), and, in a Title VII case, when an employee was told, during the period that he was otherwise eligible for a university position, that "two Chinks" in the department was "more than enough," *Chuang,* 225 F.3d at 1128. These remarks are clearly sufficient to support an inference that the decisionmaker acted in a discriminatory fashion. In other cases, we have held that some remarks lead to no reasonable inference of discrimination and thus no triable issue of material fact exists. We have found that a supervisor's comment about getting rid of "old timers" because they would not "kiss [his] ass" did not sufficiently support an inference of age discrimination, *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 918–19 (9th Cir.1996), that a comment that "we don't necessarily like grey hair" constituted "at best weak circumstantial evidence" of discriminatory animus, *Nesbit v. Pepsico, Inc.,* 994 F.2d 703, 705 (9th Cir. 1993), that the use of the phrase "old-boy network" is generally considered a colloquialism unrelated to age, *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1423 (9th Cir.1990), and that an employer's comment describing a younger employee promoted over an older employee as a "bright, intelligent, knowledgeable young man" did not create an inference of age discrimination, *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438–39 (9th Cir.1990).

Paulson's remarks in this case do not sufficiently support an inference of age discrimination so as to create a triable issue of material fact that would defeat summary judgment. In the context of this case, the phrase "old business model," does not support an inference of age discrimination. Similar to the language in *Rose,* the phrase is a colloquialism not generally associated with the target's age. Nor does Paulson's use of the term "old management team" during the same meeting create a triable issue of fact. Similarly, the management committee's use of the term "deadwood" does not suggest age discrimination. The Oxford English Dictionary defines "deadwood" as "[a] person or thing regarded as useless or unprofitable; a hindrance or impediment." 4 Oxford English Dictionary 293 (2d ed.1989).

■ Pottenger also contends that the company's June 2000 reduction in force ("RIF") disproportionately affected older employees. However, the statistical analysis of the RIF offered by Pottenger is insufficient to raise a triable issue of discrimination. A plaintiff may use statistics to show an intent to discriminate. *See, e.g., Coleman,* 232 F.3d at 1282–83; *Rose,* 902 F.2d at 1423. Potlatch, however, objects to the use of statistics from the RIF because Pottenger's dismissal was not formally part of the RIF. Nevertheless, if Pottenger can show that age was a motivating factor in determining who would be terminated under the RIF, that would constitute circumstantial evidence of discrimination in his dismissal.

Pottenger's statistical analysis of the RIF takes into account only two variables—the employee's age at the time of the RIF and whether the employee was terminated. The numbers show a statistically significant relationship between these two variables, but this court and others have treated skeptically statistics that fail to account for other relevant variables. *See Coleman*, 232 F.3d at 1283 (holding that to raise a triable issue of fact regarding pretext based solely on statistics, the statistics "must show a stark pattern of discrimination unexplainable on grounds other than age" (internal quotation marks omitted)); *see also Frank v. United Airlines, Inc.*, 216 F.3d 845, 856 (9th Cir.2000) ("An employer does not violate the ADEA by discriminating based on a factor that is merely empirically correlated with age."); *Sheehan v. Daily Racing Form*, 104 F.3d 940, 942 (7th Cir.1997) (criticizing a statistical analysis showing a correlation between age and discharge for failing to take account of any other relevant variable and finding the statistics without evidentiary significance); *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1456 (10th Cir.1994) ("[A] plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between *comparable* individuals." (internal quotation marks omitted)).

Pottenger's expert had data about other relevant variables besides age and termination status, yet his statistical analysis makes no attempt to take these variables into account. *See Coleman*, 232 F.3d at 1283; *Rose*, 902 F.2d at 1425. In addition, Pottenger declined the opportunity to make use of the variable most likely to have offered a legally appropriate explanation of why certain employees were selected for lay-off: job performance. Although job performance may have been an important factor in determining who would be laid off, Pottenger specifically acquiesced in the suggestion that obtaining data about individual employees' performance reviews was unnecessary. If Pottenger had had access to only two variables, we would be presented with a different case. But here, where Pottenger had or had access to additional relevant data and chose not to use it, we conclude that Pottenger's statistical analysis is insufficient to raise a triable issue of fact regarding pretext.

■ Pottenger also argues discriminatory motive may be inferred from the fact that his replacement was only 43 years old and that shortly before his discharge the company moved a younger employee ahead of him on the successor list for CEO. Evidence that forms part of the prima facie case may also be considered to show that a proffered explanation is pretextual. *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097. Without more, however, the fact that Nelson was younger than Pottenger does not create a triable issue of pretext. Nor does the fact that the company moved a younger employee ahead of Pottenger on the CEO successor list suggest that Potlatch acted with any discriminatory motive, for that employee had held a higher position in the company than Pottenger.

We have considered all of Pottenger's evidence of pre-text and conclude that it does not refute Potlatch's basic rationale for Pottenger's termination—that IPPD was losing money and the company lacked faith that Pottenger was the one to turn IPPD around. Potlatch has leeway to make subjective business decisions, even bad ones. *See Coleman*, 232 F.3d at 1285; *Cotton v. City of Alameda*, 812 F.2d 1245, 1249 (9th Cir.1987). It may have been unfair (and perhaps unwise) for Potlatch to blame Pottenger for IPPD's losses, but it is not surprising that Pottenger's bosses would try to make a change in leadership

in a division that was having such consistent trouble. We hold that Pottenger has not created a genuine factual issue of pretext and the district court properly dismissed his disparate treatment claim on summary judgment.

### B. Disparate Impact Age Discrimination Claim

The Supreme Court has not addressed whether plaintiffs may bring disparate impact claims under the ADEA, but this circuit permits such claims. *See Katz v. Regents of the Univ. of Cal.,* 229 F.3d 831, 835 (9th Cir.2000); *Frank,* 216 F.3d at 856; *EEOC v. Local 350, Plumbers and Pipefitters,* 998 F.2d 641, 648 n. 2 (9th Cir.1993). A disparate impact claim challenges "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Bd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

To make out a prima facie case of disparate impact, Pottenger must show "(1) the occurrence of certain outwardly neutral employment practices, and (2) a significantly adverse or disproportionate impact on persons of a particular [age] produced by the employer's facially neutral acts or practices." *Katz,* 229 F.3d at 835 (quoting *Palmer v. United States,* 794 F.2d 534, 538 (9th Cir.1986)) (alteration in original). A disparate impact claim must challenge a specific business practice. The RIF would constitute such a practice. *See Rose,* 902 F.2d at 1424–25 (holding that Wells Fargo's policy of committing employment decisions in a RIF to the subjective discretion of its managers constituted a specific employment practice subject to disparate impact analysis).

The district court found that Potlatch had discredited Pottenger's statistical evidence and therefore dismissed his disparate impact claim. Summary judgment is appropriate when statistics do not support a disparate impact analysis. *See Katz,* 229 F.3d at 835 (affirming summary judgment dismissal where the plaintiffs were "unable to set forth a substantial statistical disparity that would raise an inference of intentional discrimination"). To make out a prima facie case of disparate impact, Pottenger must show only that a facially neutral business practice had a significant adverse effect on older workers. *Arnett v. Cal. Pub. Employees Ret. Sys.,* 179 F.3d 690, 697 (9th Cir.1999), *vacated on other grounds,* 528 U.S. 1111, 120 S.Ct. 930, 145 L.Ed.2d 807 (2000). Pottenger's statistical analysis of the RIF does tend to show at least some relationship between age and termination. It does not tend to show that age *motivated* RIF decisions, which is why it does not help Pottenger establish a disparate *treatment* claim. But such a showing of causation is not necessary for a prima facie case of disparate *impact.*

In the context of this case, Pottenger's disparate impact claim nonetheless fails because Pottenger was not terminated as part of the RIF. When Potlatch discharged Pottenger in April, the RIF was under consideration, but it did not actually begin until June. Pottenger argues, however, that his discharge was functionally part of the RIF because the enhanced severance package offered to him was similar in structure (though not in dollar amount) to that suggested for use in the RIF, and because he was given 45 days to consider the package, as had been suggested for employees subject to the RIF. Pottenger acknowledges, however, that when Potlatch terminated him, the company did not use the objective, four-step evaluation process used to identify employees to be ter-

minated as part of the RIF. Moreover, Pottenger was a high-level executive, while the RIF targeted rank-and-file employees. To bring a disparate impact claim, Pottenger must show that he was subject to the particular employment practice with the alleged disparate impact. Because Pottenger was not formally or functionally subject to the RIF, his disparate impact claim cannot survive summary judgment.

## C. State–Law Tort Claims

 Finally, we affirm the district court's summary judgment dismissal of Pottenger's state-law tort claims. Potlatch's statement that Pottenger "elected to take early retirement," even if false, was not defamatory. Under Idaho law, defamatory statements are actionable without allegation and proof of special damages if they impute to the plaintiff 1) a criminal offense; 2) a loathsome disease; 3) a matter incompatible with his trade, business, profession, or office; or 4) serious sexual misconduct. *Yoakum v. Hartford Fire Ins. Co.*, 129 Idaho 171, 923 P.2d 416, 425 (1996). The statement that Pottenger "elected to take early retirement" does not impute to Pottenger any of these things.[3]

 Pottenger's intentional infliction of emotional distress claim also fails. In order to prove intentional infliction of emotional distress under Idaho law, Pottenger must show that Potlatch's conduct was "extreme and outrageous" and either "intentionally or recklessly" caused "severe emotional distress." *Brown v. Matthews Mortuary, Inc.*, 118 Idaho 830, 801 P.2d 37, 41 (1990); *Hatfield v. Max Rouse & Sons Northwest*, 100 Idaho 840, 606 P.2d 944, 953–54 (1980). Pottenger argues that the company's conduct was outrageous because he was fired after 32 years at the company, because he was not given an opportunity to save face, because people might infer he was discharged for misconduct or because he was "deadwood," and because the company incorrectly stated that he "elected" early retirement. The Idaho Supreme Court requires "very extreme conduct" before finding intentional infliction of emotional distress. *Brown*, 801 P.2d at 41. None of these allegations approach the sort of extreme conduct described by the Idaho court in cases where plaintiffs recovered for emotional distress from discharge. *See Holmes v. Union Oil Co.*, 114 Idaho 773, 760 P.2d 1189, 1197 (1988) (describing cases where a supervisor made abusive and racially motivated remarks when terminating an employee and where a manager fired waitresses in alphabetical order to coerce them into dis-

---

**3.** Pottenger also alleges defamation *per quod*—a broader category of defamation that allows a plaintiff to show injury from a statement based on extrinsic evidence or innuendo. *See Gough v. Tribune–Journal Co.*, 73 Idaho 173, 249 P.2d 192, 195 (1952). In order to state such a claim, the plaintiff must allege and prove that some special harm resulted from the statement. *Yoakum*, 923 P.2d at 425. The district court concluded that Pottenger did not allege special harm. We need not decide whether this is so, because even assuming that Pottenger did allege special harm, his defamation claim still fails. Pottenger claims that a reader could infer from Potlatch's statement that he had committed some misdeed and was therefore ter-

minated immediately. First, the announcement, dated April 19, stated that Pottenger's retirement was effective June 1. Therefore, it is not reasonable that anyone could infer he had been immediately dismissed. Second, Pottenger offers no evidence that anyone misconstrued the announcement or that anyone would. *See Bistline v. Eberle*, 88 Idaho 473, 401 P.2d 555, 558 (1965) ("The fact that the plaintiff himself places an actionable connotation on the statements does not make such statements actionable."). There is simply no reason to believe that anyone would infer that when Potlatch wrote that Pottenger had "elected to take early retirement," the phrase connoted anything disparaging about him.

closing whether one of them was stealing from the restaurant).

AFFIRMED.