BYBEE, Circuit Judge,
concurring in part and dissenting in part:
This should be a straightforward case. Plaintiff Devon Scott Shelley (“Shelley”) claims he became a victim of age discrimination when the Army Corps of Engineers (“the Corps”) denied him an opportunity to interview for a GS-14 position as Chief of the Contracting Division that ultimately went to a younger candidate. An unfiltered look at the facts reveals that of the six finalists the Corps interviewed, one candidate was older than Shelley, and two others were close to Shelley in age. The candidate the Corps ultimately hired, Vince Marsh, was already a GS-14 Supervisory Procurement Analyst, while Shelley was a GS-13 Assistant Chief.
On this record, there is no way Shelley can show that the Corps passed him over for an equally or less qualified candidate on account of his age. Rather, the record shows that 32 individuals applied for the position. A five-member selection committee, chaired by an army colonel and advised by an EEO officer, independently ranked the candidates on the basis of their resumes. Based on their individual evaluations of the candidates, the committee held a telephone conference and produced a list of the top six candidates. Shelley was not ranked among the top six, but was included in the second-tier group of nine candidates. The six finalists included three men and three women (one of whom was Shelley’s own supervisor, Connie Oberle), and were born in 1950, 1952, 1955, 1959(2), and 1963; Shelley was born in 1951. The committee then jointly interviewed the finalists and unanimously recommended hiring Marsh. In its report, the committee found that Marsh had the “strongest interview.... [It] demonstrated [his] technical competency, professionalism, leadership and strategic thinking.” The committee also found that Marsh had “the highest overall positive references.” In the Corps’s own investigation of Shelley’s complaint, every member of the committee denied that age played any role in the committee’s decision.
To this overwhelming evidence that age was not the reason the committee decided to hire Marsh and not Shelley, the majority simply points to two facts: (1) some *613 members of the committee likely knew how old Shelley was, Maj. Op. at 610, and (2) Shelley believed he had more experience and, therefore, was better qualified than Marsh, Maj. Op. at 610-11. This doesn’t come close to proving that the Corps “refuse[d] to hire [Shelley] ... because of such individual’s age.” 29 U.S.C. § 623(a)(1) (emphasis added). And because the Age Discrimination in Employment Act (“ADEA”) does not permit a mixed-motive theory, Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009), Shelley has no case at all. I would affirm the district court’s award of summary judgment, and I respectfully dissent.[1]
I
In Gross, the Supreme Court held that “under the plain language of the ADEA ... a plaintiff must prove that age was the ‘but-for’ cause of the employer’s adverse decision.” Id. at 2350. This “but-for” test applies no matter whether the case was resolved on summary judgment or after a jury trial, and it does not permit the plaintiff to rely on a mixed-motive theory. See id.
Because Shelley has no direct evidence of discrimination based on age, he must rely on the burden-shifting approach articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The majority holds that Gross did not overrule our prior cases holding that the McDonnell Douglas framework applies to a disparate-treatment ADEA claim. Maj. Op. at 607-08. I concur in that part of the opinion. Although I think the McDonnell Douglas framework is going to be difficult to apply to an ADEA claim after Gross — and the Court was coy about whether McDonnell Douglas is compatible with Gross, 129 S.Ct. at 2349 n. 2 — I agree that Gross does not clearly overrule our prior precedents. See Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir.2009) (“Gross does not conflict with our continued application of the McDonnell Douglas paradigm in age discrimination cases.”).
Even if we continue to apply the McDonnell Douglas framework to the ADEA, Shelley still shoulders the ultimate burden of showing that the Corps’s explanation — that Shelley was not as qualified as Marsh — was pretextual and that the necessary reason Shelley was not hired was because of his age. “To establish a disparate-treatment claim under the plain language of the ADEA ... a plaintiff must prove that age was the ‘but-for’ cause of the employer’s adverse decision,” Gross, 129 S.Ct. at 2350, because “the burden of persuasion [n]ever shifts to the party defending an alleged mix-motives discrimination claim brought under the ADEA,” id. at 2348.
That is a heavy burden for Shelley to carry. And he doesn’t come close on this record. The processes used by the Corps rule out impermissible bias, and the evidence relied on by the majority is insufficient to raise an issue of material fact.
II
The majority finds that “Shelley’s rejection for the 120-day position could be found to be based on age discrimination.” Maj. Op. at 611. It claims that Major Kelly Butler’s and Connie Oberle’s testimonies could show that “Butler initially *614 favored Shelley for the position, but that she used an alleged negative reference from Oberle (which Oberle denies she ever gave) as a pretext for hiring Marsh after learning that Scanlan favored Marsh for the position.” Id. at 611. I think the 120-day position is not really an issue.[2] In any event, this is simply not a reasonable inference. Although there is some dispute over whether or how Oberle conveyed a reference to Butler, whether she did offer a negative reference is beside the point (though she was going to be a candidate for the permanent position herself). It is not reasonable to infer that Butler would have chosen Shelley but for an alleged reference from Oberle. See Maj. Op. at 611. Butler did state in the Department of Defense Fact-Finding Conference of March 14, 2007 that “really, Connie’s reference is why we did not choose Scott [Shelley].” Yet the Facl — Finding Conference at which she testified was not convened to consider Shelley’s complaint, and, in context, her statement is not particularly probative. Moreover, in her deposition for this case she clarified her testimony, saying: “I didn’t mean to indicate that I was ready to hire him and Connie Oberle said no. That’s not the case.... Connie’s reference is one of the reasons we did not choose Scott.... I did not mean to infer that she was the only reason that ... he wasn’t chosen.” She stated that she based her hiring decision on Marsh’s being “the most qualified out of the nine” who applied.
Furthermore, it is unreasonable to infer that Butler changed her mind after input from Scanlan. She testified that she was the only one who reviewed the resumes for that position, and she made the decision in consultation with Colonel Michael Rossi, Commander for the Kansas City District, and Steve Iverson, Deputy District Engineer for Project Management for the Kansas City District. Although Scanlan may have been “a part of the process” and let Butler know that Marsh was his top pick, there is no indication that he was involved in the substance of the decision, and Shelley produced no evidence to contradict Butler’s account of how the decision was made. A reasonable jury could not reasonably conclude from the evidence that discrimination was the but-for cause of Shelley failing to receive the 120-day position.
With regard to the permanent position, Shelley’s biggest problem is that before he can make out a case that he did not get the position because of his age, Shelley has to show that he was passed over for an interview because of his age. This he cannot do. Of the six candidates who were actually selected for a final interview (from a list of 82), one was older than Shelley, one was only a year younger, and another was *615 four years younger. The fact that the Corps considered qualified candidates older than (or about the same age as) Shelley without offering Shelley an interview is fatal to his claim. It is true that the fourth traditional element for establishing a prima facie case in failure to promote cases under the McDonnell-Douglas framework — that the employee be replaced by someone substantially younger, O’Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) — is not a strict requirement. A plaintiff can produce more probative evidence of discrimination, or he can show that the decision to hire another member of the protected class (or in ADEA cases, a person of similar age) was a pretext to hide the discriminatory decision. See Diaz v. Am. Tel. & Tel., 752 F.2d 1356, 1359-62 (9th Cir.1985) (Title VII); see also Diaz v. Eagle Produce Ltd. P’ship, 521 F.3d 1201, 1207-08 & n. 2 (9th Cir.2008). While I deal with the former type of evidence below, there is no evidence of the latter grand conspiracy, that candidates of the same age as Shelley were given interviews to hide the already-made decision that Marsh would be given the position. Because age must be the but-for cause, see Gross, 129 S.Ct. at 2350, the fact that the committee ranked other similarly-aged applicants higher than Shelley suggests that even without any alleged age bias, he still would have not received the job because another similarly-aged applicant would have taken it instead.
Since the Corps interviewed similarly situated candidates, but not Shelley, the only plausible conclusion from this set of facts is that some reason other than age caused the selection committee to decide not to interview Shelley. And if the committee had some reason other than age— indeed, if it had any other reason — then Shelley cannot satisfy Gross’s “but-for” test.
Ill
The majority finds that “Shelley presented direct evidence of age discrimination to rebut the Corps’ purported nondiscriminatory reason.” Maj. Op. at 609. The majority is just wrong on all accounts.
First, the majority (as did Shelley) framed its theory of the case in terms of the McDonnell Douglas burden-shifting analysis. See Maj. Op. at 608. But that test is used when the plaintiff has to rely on inferences that are not based on direct evidence. As we have explained, “[w]hen a plaintiff alleges disparate treatment based on direct evidence in an ADEA claim, we do not apply the burden-shifting analysis set forth in [.McDonnell Douglas ].” En-low v. Salem-Keizer Yellow Cab Co., 389 F.3d 802, 812 (9th Cir.2004). In Enlow, we were simply following the Supreme Court’s instruction that “the McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination.” Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).
Second, even if we look at the majority’s “direct evidence,” it is anything but direct. As we explained in Coghlan v. American Seafoods Co.: “Direct evidence is evidence “which, if believed, proves the fact [of discriminatory animus] without inference or presumption.’ ” 413 F.3d 1090, 1095 (9th Cir.2005) (alteration in original) (quoting Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir.1998)). It “typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer.” Id.; see also Enlow, 389 F.3d at 812 (“Direct evidence, in the context of an ADEA claim, is defined as ‘evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting *616 the alleged discriminatory attitude ... sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer’s decision.’ ”) (quoting Walton v. McDonnell Douglas Corp., 167 F.3d 423, 426 (8th Cir.1999) (internal quotation marks omitted)).
The majority’s “direct evidence” is a single fact — that two members of the permanent position selection committee (Regional Contracting Chief Joseph Scanlan and Business Management Division Chief Kevin Brice) obtained a document called the “Capable Workforce Matrix” (the “matrix”), which lists projected vacancies in what appears to be the Walla Walla Contracting Division.[3] Maj. Op. at 609. The matrix lists each of the positions in the division and, among other information, when the positions were expected to become vacant due to planned departures or retirements. The matrix does not mention the name of any member of the division, but one who is familiar with the division could deduce names based on the titles listed. For instance, the matrix indicates that the division currently employs one Assistant Chief of Contracting, and that the incumbent is scheduled to either leave or retire in fiscal year 2006. One who is familiar with the division would know that the Assistant Chief of Contracting is Shelley and would know, based on the matrix, that he is scheduled to either leave or retire from his position in the Walla Walla division in 2006. From this fact, the majority deduces “an inference that they considered this information relevant to their decision.” Maj. Op. at 610 (emphasis added). But an inference, we have said quite clearly, is not direct evidence. Coghlan, 413 F.3d at 1095.
Moreover, even taking this evidence as circumstantial evidence, it doesn’t amount to a hill of beans. There is no evidence in the record that Scanlan or Brice actually looked at the list, that either of them tried to link up Shelley’s name to the list, or (even assuming that they did) that either took into account Shelley’s age. In fact, the only evidence in the record is to the contrary. Scanlan testified that although he probably received the matrix, he did not recall seeing it; both testified that age was not a consideration. Nothing indicates that this request was anything out of the ordinary. Scanlan and Brice were entitled to these documents by virtue of their positions. Scanlan testified that “the matrix is a working document used for regional workforce planning purposes!, a]nd it is updated periodically for workforce planning purposes”; all of the districts, not just Walla Walla, were periodically to provide that information for use in projecting future requirements for different types of positions. So even if Scanlan or Brice had determined Shelley’s retirement date from the matrix, that fact, without more, is irrelevant. And because Shelley’s supervisor, Oberle, was on the same sheet and as readily identifiable as Shelley, there is no reason to think that they would not also deduce her age and discriminate against her — which they did not, because she received an interview.
Furthermore, as the majority concedes, all of the applicants had submitted resumes from which their ages could have been estimated, Maj. Op. at 603-04, and Scanlan had worked with Shelley for a number of years, so it would not be surprising if he knew Shelley’s age. Indeed, the majority holds that Shelley has proved a prima facie case under McDonnell Doug *617 las, which in the context of an ADEA claim means that Shelley has shown that “the promotion was given to a substantially younger person.” Maj. Op. at 608. Thus, the majority began from the premise that everyone knew that Marsh was younger than Shelley. But aside from the bare fact of knowing Shelley’s age, there are no statements by Scanlan or Brice, no emails, and no off-hand remarks to Shelley or others about Shelley’s age. Yet “[w]ithout more, ... the fact that [Marsh] was younger than [Shelley] does not create a triable issue of pretext.” Pottenger v. Potlatch Corp., 329 F.3d 740, 748 (9th Cir.2003). If mere awareness of an applicant’s age is direct evidence of discrimination sufficient to show pretext, no disappointed-applicant-turned-plaintiff need ever worry about summary judgment again. Indeed, even in cases in which employers have not only noticed but also commented in potentially negative ways about a plaintiffs age, we have found that this weak evidence is insufficient to justify a trial. See id. at 747 (compiling cases).
IV
The majority works very hard to come up with indirect evidence of pretext. Shelley may establish pretext “indirectly, by showing that the [Corpses proffered explanation is ‘unworthy of credence’ because it is internally inconsistent or otherwise not believable, or [ ] directly, by showing that unlawful discrimination more likely motivated the employer.” Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1127 (9th Cir.2000) (quoting Godwin, 150 F.3d at 1220-22). Because Shelley has no direct evidence, the circumstantial evidence upon which he relies to refute the Corps’s proffered explanation must be “‘specific’ and ‘substantial’ to create a genuine issue of material fact.” Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1029 (9th Cir.2006) (quoting Godwin, 150 F.3d at 1222). What the majority comes up with is strict scrutiny of Shelley’s and Marsh’s resumes and a conclusion that “Shelley’s resume demonstrated sufficient qualifications that a reasonable jury could find that he was substantially better qualified than Marsh.” Maj. Op. at 611.
The majority did not articulate the correct legal standard. While we have held that a “district court’s finding that a Title VII plaintiffs qualifications were clearly superior to the qualifications of the applicant selected is a proper basis for a finding of discrimination,” Odima v. Westin Tucson Hotel, 53 F.3d 1484, 1492 (9th Cir.1995), we have yet to articulate a precise standard in the summary judgment context. In Raad v. Fairbanks N. Star Borough School Dist., 323 F.3d 1185 (9th Cir.2003), we declined to establish the high hurdle that the Fifth Circuit adopted in Odom v. Frank, 3 F.3d 839, 847 (5th Cir.1993) (requiring that the “disparities [be] so apparent as virtually to jump off the page and slap us in the face”). 323 F.3d at 1194. The Supreme Court also thought the standard in Odom was “unhelpful and imprecise,” though it did not choose to give its own articulation of the correct standard. Ash v. Tyson Foods, Inc., 546 U.S. 454, 457, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006). Thus, we are left with the notion in Rood, that a “pronounced difference” in qualifications can be enough, 323 F.3d at 1194, but without more guidance on what lesser quantum would also be sufficient.
Yet, surely situations in which the qualifications are so similar that they could easily be thought to be equal cannot justify a trial. More importantly, it cannot be that the standard is that a reasonable jury could find that one applicant is more qualified — however slightly — than another; we cannot ask the jurors which of two candidates they prefer. Rather, it must be that *618 a reasonable jury could think that there is such a disparity in their qualifications that the choosing of Marsh over Shelley is only explainable because of the differences in their age. This is a higher threshold than the majority’s new formulation. See Ash, 546 U.S. at 457, 126 S.Ct. 1195 (“Under this Court’s decisions, qualifications evidence may suffice, at least in some circumstances, to show pretext.”); Cornwell, 439 F.3d at 1033 (“[A] reasonable jury might also view the disparity between Cornwell’s management experience and Hall’s as proof that Defendants’ explanation for Cornwell’s demotion was a pretext for race discrimination.”); Raad, 323 F.3d at 1197 (“[T]he fact that an employer hired a far less qualified person than the plaintiff naturally gives rise to an inference that the non-discriminatory explanation offered by the employer is pretextual.”).[4]
Shelley cannot show that his qualifications were so clearly superior to Marsh’s that a jury could reasonably find that Marsh was promoted over Shelley on account of age. In fact, it is far from clear that Shelley was even marginally better qualified than Marsh. Shelley relied on no evidence other than his own declaration and his resume. He offered no expert witnesses who could evaluate the very technical language of contracting and procurement hierarchy, he proffered no colleagues who thought that he was better qualified, and he couldn’t point to any irregularities in the selection process. All we have is Shelley’s own opinion of his relative qualifications. And because he has no other evidence to support his claim of age discrimination, Shelley rests his entire case on the theory that his qualifications are so vastly superior to Marsh’s that there is no other explanation for the selection committee’s decision other than the disparity in their ages. With all due respect, we have no business substituting our judgment for the selection committee. And our judgment does not improve by inviting jurors to decide which of the two they would have hired.
According to the selection criteria, the selection committee was supposed to evaluate resumes according to four criteria: (1) technical competency, (2) management, (3) leadership, and (4) teamwork. With regard to technical competency, the criteria required the committee to consider four factors: demonstrated knowledge of federal contracting regulations, experience in overseeing multimillion dollar contracts, knowledge and experience in applying federal regulations, and experience in developing contract strategies to support large acquisition programs. The selection criteria add that an outstanding candidate should possess a graduate level degree.
Shelley had two things going for him relative to Marsh. He had more experience — Shelley had 29 years of contracting experience, while Marsh had 21 years of experience — and Shelley possessed an MBA from Northwest Nazarene University. The MBA degree was a plus for Shelley, but the years of experience tell us nothing. Both candidates had at least 20 years of experience. We have no basis for deciding that Shelley’s additional years made him a superior candidate; if so, then every employer must promote on the basis of years of experience alone. But every employer knows that mere years in service is not a perfect proxy for competence. And indeed, if one were to rely on “experi *619 ence” alone, Oberle would be an obvious choice over Shelley because she already had the very same position in Walla Walla as was being offered in Kansas City.
More importantly, the technical competency criterion called for the candidates to have “[e]xperience in overseeing multimillion dollar contracts.” While Shelley’s resume lists “supervis[ing]” and “coordinat[ing]” contracts as among his responsibilities, he failed to list any specifics or examples of the contracts that he managed. In his declaration prepared for this lawsuit, Shelley claimed that he had supervised “multi-million dollar military construction contracts” in Afghanistan, a $100,000,000 power house at Minidoka Dam for the Bureau of Reclamation, multi-million dollar dam projects in the Pacific Northwest, a $200,000,000 modernization project at McNary Dam, and other contracts exceeding $10,000,000 on the Columbia and Snake rivers. All of that is very impressive. Unfortunately, none of it was on Shelley’s resume. For example, Shelley testified as to the projects he worked on in Afghanistan, for which he was awarded the Bronze Star.
Q. Are those — are those examples listed in your resume?
A. They’re referenced in my Bronze Star award. Not the contracts specifically.
Q. But if I look at the passage on the Bronze Star award will I see any reference to those specific projects?
A. I don’t think so.
Q. Should the panel have considered those projects when they were looking at your resume?
A. Yes.
Q. And they have done that by finding it out from something other than your resume?
A. Yes.
He didn’t fare any better on the other projects he claimed in his declaration. Here is the testimony on the Minidoka Dam project:
Q. Is that example listed anywhere in your resume?
A. No.
He was asked about his experience with the dams in the Pacific Northwest:
Q. Where in your resume does it mention ... the complex earth dams throughout the Pacific Northwest? Or the Grand Coulee Dam?
A. I don’t list them specifically.
His Walla Walla experience didn’t show up either:
Q. Where is that in your resume?
A. It’s not specifically stated, but it’s implied with my unlimited warrant in my resume.
By contrast, Marsh’s resume specifies that he “[sjerved as the Contract Administrator for the $1.3 billion Health Care Delivery and Administrative Support Services contract.” The majority’s answer for Shelley’s failings in this regard is to explain that Scanlan, who served on the selection committee, was already personally “familiar with Shelley’s experience and credentials.” Maj. Op. at 611. But we have no idea whether Scanlan knew all the details Shelley omitted, and suggesting that one member of the selection committee “knows your record” is not the same thing as submitting a complete application to the committee. The decision not to interview Shelley was not up to Scanlan alone — it was up to a five-member selection committee, of which Scanlan was just one member. As Colonel Rossi, who chaired the selection committee, explained, each member of the selection committee independently reviewed resumes from dozens of applicants before convening via teleconfer *620 ence to decide on who to interview. Given the structure of the application process, Shelley should not have expected Seanlan to fill in the blanks in his resume if he failed to submit a complete resume in the first place; it is unreasonable for him to expect the remaining members of the committee to rank him based on information he didn’t supply. In sum, though Shelley claimed to have had experience managing large contracts, there is no way to tell based on his resume, which offers only general descriptions of his past experience.
With respect to management and leadership, the selection criteria emphasize experience serving as branch or section supervisor with over 30 employees, managing “large, multidisciplined” organizations and overseeing the execution of multi-million dollar contracts. Here, the differences between the candidates’ resumes really show. At the time he applied, Shelley was Assistant Chief in the Contracting Division, a GS-13 position. He previously had positions as a Team Leader, Supervisory Contract Specialist, and Contract Specialist. Although the criteria specifically mentioned that the candidates should be “branch or section supervisor ... with over 30 employees,” Shelley did not list the number of employees he supervised in any of his positions. By contrast, Marsh was a Supervisory Procurement Analyst, which was a GS-14 position, and he stated that he supervised 15 employees. In his previous position as Supervisory Contract Specialist, he had supervised 75 contract specialists, including 14 contracting officers. And prior to that he had supervised 13 German and American contract specialists and three contracting officers in Germany.
The majority recognizes that Shelley didn’t respond directly to the criteria, but props him up anyway: “While Shelley’s resume did not specify the number of employees he supervised, it did disclose that, as Assistant Chief of Contracting, he supervised, coordinated and managed the work of subordinate Team Leaders, who presumably led teams.” Maj. Op. at 619— 20 (emphasis added). Unfortunately, it is a big presumption. Shelley stated that, around 1985, he was temporarily made the Chief of the Walla Walla Division. Here is his testimony:
A. How long have you served as a Division Chief, how many days?
Q. I can’t even number them on my head.... I was constantly made the Division Chief.
Q. Is that noted on your resume?
A. I don’t see that I covered that in there.... They wouldn’t have seen it from my resume.
Q. So is there anywhere in your resume where it reflects that you acted as a Division Chief for any significant period of time?
A. I don’t see it in there.
To counteract the failings in Shelley’s resume, the majority then disparages Marsh’s resume because his supervising 75 employees was not part of his regular job duties. See Maj. Op. at 610. From all of this, the majority calls the round a tie because “[njeither candidate clearly demonstrated that he met this criterion.” Id. at 610.
The majority is wrong, of course. The most notable distinction between the two resumes was that Shelley was not the head of his office and Marsh was. That inconvenient fact is also reflected in one other critical fact: Marsh’s demonstrated competence had been rewarded with a GS-14 position, while Shelley was still a GS-13. The majority’s answer to this is incomprehensible. It says that this was “relevant *621 only as to the 120-day position” because, if Shelley had been given the 120-day position, he too would have been a GS-14. Id. at 611. The majority has missed the whole point: Marsh was already a GS-14 when the 120-day position opened; even though he was younger than Shelley and had fewer years with the Corps, he held a higher position, at least as measured by his supervisory responsibilities and his pay grade. See Pottenger, 329 F.3d at 748 (“Nor does the fact that the company moved a younger employee ahead of Pottenger on the CEO successor list suggest that [the company] acted with any discriminatory motive, for that employee had held a higher position in the company than Pottenger”).
With regard to the final criterion, teamwork, the criteria emphasize the ability to work with customers and other departments, offices, and teams in a multi-disciplinary setting. Marsh’s resume lists relevant experience such as serving as his directorate’s point of contact with Congress and the Army Audit Agency, in addition to maintaining working relationships with counterparts throughout the Department of Defense, U.S. Small Business Administration, and other federal agencies. Shelley’s resume, on the other hand, fails to list any comparable experience. The majority opinion is just silent on this criterion.
From all of this, the majority deduces that “a reasonable jury could find that [Shelley] was substantially better qualified than Marsh.” Maj. Op. at 611 (emphasis added). The majority thus sides with Shelley, who bitterly claims that “Marsh should have received a ‘minimally aceeptable’ evaluation.” But repeating it does not make it so. At the very least, Marsh had a resume equal to or better than Shelley’s. And these were not the only two candidates. The selection committee was responsible for ranking 32 applicants, among whom were a number of qualified individuals, including Shelley’s supervisor. Based on the relevant resume screening criteria, along with the fact that Marsh was already a Supervisory Procurement Analyst, there is no evidence to show that Shelley was “substantially better qualified” than Marsh. And without that evidence, Shelley has nothing to show that the Corps’s explanation — that the selection committee thought there were six candidates better qualified than Shelley — was pretextual.[5]
Indeed, the majority overlooks a straightforward conclusion based on evidence that it discusses. In the panel members’ initial rankings — which were done individually and prior to any discussion with other panel members — Marsh received four top rankings and one mid ranking; Shelley received three top rankings and two mid rankings. Even assuming that Scanlan was the one who gave Marsh a top ranking and Shelley a mid ranking, that means that the other panel members independently came to the conclusion that Marsh was at least as qualified as Shelley. Furthermore, a different panel member changed his score for Shelley (downgrading him from mid to bottom). Even if this change came after the panel members’ discussion — in which the evidence only shows that age was never discussed and neither was Shelley in particular — that means that at least two panel members concluded that Marsh was a bet *622 ter applicant than Shelley. Thus, even if Scanlan did have animosity toward Shelley based on his age (for which there is no evidence whatsoever), Marsh would still have been strongly preferred over Shelley by the committee as a whole.
There is more than sufficient evidence to affirm the district court’s grant of summary judgment, even without considering the Gross “but-for” test. See Coleman v. Quaker Oats Co., 232 F.3d 1271, 1285 (9th Cir.2000) (holding that comments related to age, the plaintiffs own evaluations of his qualifications, and the use of subjective evaluations for promotion were still insufficient to raise an issue of fact concerning discriminatory motive). Once we factor Gross into the mix, it is apparent that Shelley cannot show that the Corps’s decision is unexplainable on any basis other than age discrimination.
s¡< í¡< i); %
There is not only no evidence of age discrimination against Shelley, there is no evidence of age discrimination in favor of Marsh. On this record, Shelley has failed to satisfy even his minimal burden of showing that his age “actually played a role in [the Corps’s decision-making] process and had a determinative influence on the outcome,” Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)), much less advance any evidence of “but for” causation for his ADEA claim. Accordingly, I would affirm the grant of summary judgment.

. Because I agree that Shelley exhausted his administrative remedies, I concur in Part I of the majority opinion. I also agree that the district court erred in holding that the McDonnell Douglas framework does not apply to ADEA claims. Accordingly, I concur in Parts I through II.A of the majority opinion.

. The majority mischaracterizes the Corps's explanation for its decisions as being that Marsh was already a GS-14 whereas Shelley was only a GS-13. Maj. Op. at 609. As I discuss in Part IV, Marsh’s prior permanent GS-14 position is of course relevant and demonstrates his superior qualifications, though it is hardly the only way in which he was a better applicant than Shelley. The Corps has contended throughout that the six candidates selected for an interview were each generally better qualified than Shelley and that the selection process worked cor-rectify; even Shelley acknowledged this as the explanation offered by the Corps. Because of this mischaracterization, the majority can claim that the Corps’s explanation was irrelevant for the permanent hiring decision because if Shelley had received the temporary position, his receiving the permanent position would have been a lateral move, too. See Maj. Op. at 611. It also paves the way for the majority's erroneous conclusion that a "reasonable jury [could] find that the Corps’ reliance on Marsh’s GS-14 level, as compared to Shelley’s GS-13 level, was pretextual.” Maj. Op. at 611.

. For the reasons set out above, this piece of evidence is irrelevant to the 120-day position and only potentially probative for discrimination in the selection for the permanent position.

. I note that in these cases the standard of proof is not as demanding as in this ADEA case. Because these cases were brought under Title VII and similar causes of action, demonstrating mixed motives would have been sufficient in each; the plaintiffs did not need to prove but-for causation. See, e.g., Desert Palace, Inc. v. Costa, 539 U.S. 90, 94, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

. It should also be noted that, for the same reasons that Marsh demonstrated better qualifications for the permanent position, he also demonstrated better qualifications for the 120-day position. In any case, Marsh already held the same job title as the 120-day position. Thus, for neither position can Shelley rebut the Corps's legitimate, nondiscriminatory justification.